UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Felipe Visar

_____

Write the full name of each plaintiff.

18 CV 05987 (CM)

(Include case number if one has been assigned)

-against-

See Attached City of New York, Angel Bussive,
John DOE HRA Employee #1, John Doe Police Officers #1-18,
John Doe Security Guards #1-4; John Doe Paramedics #1-2
New-York-Presbyterian Hospital, Dino Diaz, Valarie Soto, Ana Sears

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

**AMENDED**

**COMPLAINT**

Do you want a jury trial?
☐ Yes  ☒ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/7/18

## I.    BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☒    **Federal Question**

☐    **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

42 U.S.C. § 1983, 14th Amendment, 4th Amendment, 1st Amendment, and among others pendent state claims.

## B.   If you checked Diversity of Citizenship

### 1.    Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____, is a citizen of the State of

(Plaintiff's name)

_____

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                  (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____ .

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____ .

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

Felipe        F.        Vivar
First Name        Middle Initial        Last Name

804 W 180th Street    Apt. 31
Street Address

New York        New York        10033
County, City        State        Zip Code

646-850-0115
Telephone Number        Email Address (if available)

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

Angel _____ Bossue _____
First Name            Last Name

Supervisor at Human Resources Administration
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City                State            Zip Code

Defendant 2:

Dino _____ Diaz _____
First Name            Last Name

Caseworker at Selfhelp Community Services
Current Job Title (or other identifying information)

520 8th Avenue 5th Floor
Current Work Address (or other address where defendant may be served)

New York            New York        10018
County, City                State            Zip Code

Defendant 3:

Selfhelp Community Services
First Name            Last Name

_____
Current Job Title (or other identifying information)

520 8th Avenue 5th Floor
Current Work Address (or other address where defendant may be served)

New York            New York        10018
County, City                State            Zip Code

Defendant 4: _Human Resources Administration_

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                    State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: _804 W 180th Street Apt. 31, New York, NY 11411, New York - Presbyterian Hospital, Gracie square Hospital_

Date(s) of occurrence: _June 21, 2018 - August 14, 2018_

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_See. Attached page 5_

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

I have suffered emotionally and mentally. I receive medical treatment from a physcian and see a psychanitist weekly. I attend pain mangement.

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

$ 300 million in money damages for my pain and suffering, damaged, and lost property.

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| 11/7/18 | Felipe Vivar |
| Dated | Plaintiff's Signature |
| Felipe | F. | VIVAR |
| First Name | Middle Initial | Last Name |

804 W. 180th St. #31
Street Address

| New York | Ny | 10033 |
|---|---|---|
| County, City | State | Zip Code |

| 646-850-0115 | None |
|---|---|
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

**List of Defendants**

5. City of New York

6. JOHN DOE HRA EMPLOYEE #1, personal and official capacity

   Human Resources Administration

7. JOHN DOE POLICE OFFICERS #1–18, personal and official capacity

8. JOHN DOE SECURITY GUARDS #1–4

   New York-Presbyterian Hospital

   177 Fort Washington Ave, New York, NY 10032

9. JOHN DOE PARAMEDICS #1–2, personal and official capacity

10. New York-Presbyterian Hospital

    177 Fort Washington Ave, New York, NY 10032

11. VALERIE SOTO, in their personal and official capacity

    Supervisor at Selfhelp Community Services

    520 8th Avenue, 5th Floor New York, NY 10018

12. RIVAS SEARS, in their personal and official capacity

    Supervisor at Selfhelp Community Services

    520 8th Avenue, 5th Floor New York, NY 10018

13. New York-Presbyterian Hospital: Gracie Square Hospital

    Gracie Square Hospital

    420 East 76th Street, New York, New York 10021

14. Dr. REBECCA KASTOPOULOUS, in their personal and official capacity

    Gracie Square Hospital

    420 East 76th Street, New York, New York 10021

15. JOHN DOE GRACIE SQUARE NURSE #1

Gracie Square Hospital

420 East 76th Street, New York, New York 10021

**Statement of Facts:**

1.  PLAINTIFF is FELIPE Viva, a 46-year-old male of Latino descent.

2.  PLAINTIFF resides at 804 W 180th Street, Apt. 31, New York, NY 10033.

3.  PLAINTIFF has various medical conditions: hypertensive kidney disease associated to stage 2 CKD, with stage 1 through stage 4 chronic kidney disease, or unspecified kidney disease; hyperlipidemia; obesity; an overactive bladder; anxiety disorder; unspecified intellectual disabilities; and sarcoidosis.

4.  On October 10, 2001 the Civil Court of the City of New York appointed MARY ROSADO as Guardian ad Litem of PLAINTIFF to help PLAINTIFF with an eviction notice because of his various medical conditions and unspecified learning disabilities. The court vacated the judgment of eviction, and PLAINTIFF continued receiving assistance from ROSADO on housing matters. With the help of ROSADO and JOSE CANDELARIO, a friend of PLAINTIFF, PLAINTIFF obtained services from Selfhelp to keep his apartment in 2001. Selfhelp pays the landlord PLAINTIFF's rent and provides PLAINTIFF a bi-weekly stipend for groceries and other basic amenities. Currently, PHILLIP ELIK, a Selfhelp caseworker, serves as PLAINTIFF's Guardian ad Litem for housing court.

5.  Selfhelp Community Services ("Selfhelp") operates a licensed not-for-profit home care program that employs over 1800 home health aides who provide care each year. They provide skilled nurses assistance with bathing, grooming, housekeeping, and preparing meals and performing other daily chores. Selfhelp allows individuals to continue to live independently.

6.  Beginning in May 2018, PLAINTIFF began to make verbal complaints regarding various employees of Selfhelp and Human Resources Administration ("HRA") to 311 because of Selfhelp and HRA treated PLAINTIFF. On May 15, 2018 PLAINTIFF called 311 to complain about a recent visit to Selfhelp to pick up his check. While waiting to receive his check,

1

PLAINTIFF asked to use the bathroom because of he has an overactive bladder and a place to sit because of his joint pain. PLAINTIFF was told he could not use the bathroom and had to wait. PLAINTIFF informed the Selfhelp staff of his medical condition and need to go to the bathroom. VALERIE SOTO, a caseworker, came downstairs and told PLAINTIFF that she would force him to wait because of his behavior in the lobby. PLAINTIFF did not understand SOTO's comments because he had not acted inappropriately in the lobby. SOTO called PLAINTIFF a fat faggot and said he cannot use the restroom. PLAINTIFF proceeded to wait for two hours before speaking with a Selfhelp caseworker and obtaining his check. While waiting in the lobby, PLAINTIFF did not verbally or physically threaten, intimidate, or frighten SOTO or another person, nor did he attempt to do any of these actions. On May 31, 2018, PLAINTIFF called 311 and again complained about Ms. SOTO because no actions had been taken by Selfhelp since he complained to 311 on May 15, 2018 about Ms. SOTO yelling at him when he went to pick up his check.

7.      Before May 2018, employees from Selfhelp and HRA made several unwelcomed visits to his apartment. PLAINTIFF made complaints to 311 about these visits because he wished to not have any visitors from Selfhelp and HRA so that he could rest. On May 17, 2018, PLAINTIFF made a 311 complaint against RAFAEL MEDINA, a caseworker with HRA, for making an unwelcomed visit to his apartment. MEDINA knocked on PLAINTIFF's door, asking to come inside. PLAINTIFF told MEDINA that he did not want any visitors and to leave PLAINTIFF alone. On June 1, 2018, PLAINTIFF complained to KEVIN T. BYRNE, Vice President of HRA, about his issues with Mr. MEDINA visiting PLAINTIFF'S apartment without PLAINTIFF's consent. Mr. BRYNE stated he would not help PLAINTIFF and hung with PLAINTIFF abruptly. On that same day, PLAINTIFF made a follow-up complaint with 311 against Mr. BRYNE and Mr. MEDINA.

2

8.     PLAINTIFF then spoke with ANGEL BUSSUE, a unit supervisor with HRA, to address his 311 complaints. BUSSUE told PLAINTIFF to stop filing the 311 complaints or the police will be called. PLAINTIFF informed ANGEL BUSSUE that Mr. PLAINTIFF told BUSSE that MEDINA had attempted to enter PLAINTIFF's without PLAINTIFF's permission and that he did not want visitors and wanted to rest at home given his various medical conditions. PLAINTIFF never threatened any HRA officials. PLAINTIFF never yelled at any HRA officials. PLAINTIFF never physically assaulted any HRA officials.

9.     Upon PLAINTIFF'S information and belief, based on a conversation between PLAINTIFF and a secretary from Selfhelp, 311 had informed HRA about the various complaints PLAINTIFF had made against HRA and Selfhelp employees. After receiving PLAINTIFF's 311 complaints, JOHN DOE HRA EMPLOYEE #1 contacted Selfhelp by email and alleged that PLAINTIFF was disturbed and made threats of violence against VIRVAS SEARS, a supervisor at Selfhelp, and DINO DIAZ, a caseworker at Selfhelp. Prior to June 21, 2018, PLAINTIFF did not make threats of violence against RIVAS SEARS and DINO DIAZ. Selfhelp then called the police to come to PLAINTIFF'S apartment and escort him to the hospital based on this information.

10.     On or about June 21st, 2018, at approximately 10:00am, PLAINTIFF was asleep in his living room of his apartment committing no visible crime. PLAINTIFF was not threatening anyone, physically attacking anyone, or causing any disturbance of any kind. PLAINTIFF was in his underwear, groomed, and appeared in good physical health.

11.     Around 10:00am, PLAINTIFF heard banging on his door with what he perceived to be hands and flashlights. Whomever was at PLAINTIFF's door had not buzzed before entering the building. PLAINTIFF went to the door of his apartment to unlock it. After PLAINTIFF unlocked his door and opened the door slightly, JOHN DOE POLICE OFFICERS

3

#1–8 rushed in while he was still in his underwear. PLAINTIFF did not invite the officers into the apartment. PLAINTIFF did not consent to the officers coming in to the apartment. JOHN DOE POLICE OFFICERS #1–8 did not ask any questions to PLAINTIFF or announce why they were at his apartment before coming in or after. The JOHN DOE POLICE OFFICERS did not have a warrant or any exigent circumstance permitting them to enter PLAINTIFF's home.

12.     PLAINTIFF asked if he could put on clothes and JOHN DOE POLICE OFFICERS #1–8 told him he could.

13.     PLAINTIFF then proceeded to the other rooms within his apartment in order to grab clothes. JOHN DOE POLICE OFFICERS #1–8 followed PLAINTIFF into the other rooms, still not stating why they were there. PLAINTIFF then announced he wanted to go into a drawer to grab some documents showing that he requested to be left alone. JOHN DOE POLICE OFFICERS #1–8 then searched PLAINTIFF'S drawer without permission.

14.     After being in the apartment for about an hour, JOHN DOE POLICE OFFICERS #1–8 said they were taking PLAINTIFF to the hospital for an evaluation but did not disclose why they believed PLAINTIFF needed to go to the hospital. PLAINTIFF never threatened the JOHN DOE POLICE OFFICERS #1–8. PLAINTIFF never yelled at JOHN DOE POLICE OFFICERS #1–8. PLAINTIFF never physically assaulted JOHN DOE POLICE OFFICERS #1–8. PLAINTIFF remained calm while the police officers were in his apartment and stood in his living room waiting for the police officers to speak to him. JOHN DOE POLICE OFFICERS # 1-8 did not conduct an independent evaluation of PLAINTIFF to determine if he was an imminent danger to himself or others.

15.     PLAINTIFF was taken to the ambulance that was outside his apartment. JOHN DOE POLICE OFFICERS #1–2 rode in the back of the ambulance with PLAINTIFF to a hospital. Plaintiff was not placed in handcuffs, but the officers' statements made PLAINTIFF

4

believe that he had to cooperate and that he would be placed in handcuffs if he did not.
PLAINTIFF did not want to go to the hospital. PLAINTIFF was then taken to New York-
Presbyterian Hospital: Milstein Emergency Department. He was then placed into a room by
JOHN DOE POLICE OFFICERS #1–2 and paramedics.

16.     PLAINTIFF was afraid to try and leave. He was involuntarily committed and
imprisoned at the hospital. At no point prior to being involuntarily committed did he threaten to
injure himself or another person. At no point did PLAINTIFF verbally or physically threaten,
intimidate, or frighten another person, nor did he attempt to do any of these actions.

17.     PLAINTIFF remained at the hospital from June 21, 2018 until June 22, 2018.
PLAINTIFF was forcibly hospitalized for 1 days and a few hours.

18.     Shortly after being placed in the room, JOHN DOE POLICE OFFICERS #1–2
left and JOHN DOE SECURITY GUARDS #1–2 entered the room. JOHN DOE SECURITY
GUARDS #1–2 and JOHN DOE PARAMEDICS #1–2 told the PLAINTIFF to take off his
clothes and put on a gown. JOHN DOE SECURITY GUARDS #1–2 and the JOHN DOE
PARAMEDICS #1–2 made the PLAINTIFF squat to conduct an anal cavity search and then
proceeded to take his belongings. PLAINTIFF did not consent to this search. Prior to the search,
PLAINTIFF gave no indication that he had hidden drugs or weapons on his person. These
Defendants had no basis to believe that PLAINTIFF had hidden drugs or weapons on his person.
PLAINTIFF was not given any injections at this time. PLAINTIFF spoke with an orderly and
was told he was going to be placed in the psych ward.

19.     JOHN DOE SECURITY GUARDS #1–2 then escorted PLAINTIFF to a room
with chairs in them and PLAINTIFF remained in this room for a day. PLAINTIFF waited
between four and five hours before speaking with a doctor. The doctor had asked PLAINTIFF if
he wanted to hurt himself, and PLAINTIFF stated no. PLAINTIFF then waited an additional four

to five hours before speaking with JOHN DOE NURSE #1. JOHN DOE NURSE #1asked

PLAINTIFF if he wanted to hurt himself, and PLAINTIFF stated no. PLAINTIFF complained to

JOHN DOE NURSE #1 that he could not breathe and needed his inhaler. JOHN DOE NURSE

#1 told PLAINTIFF that he needed to take pills if he wished to be released. PLAINTIFF said he

did not want to take the pills. JOHN DOE NURSE #1 said if he did not take them, PLAINTIFF

could not leave the facility. PLAINTIFF took the pills and remained in the room without

receiving medical attention for his breathing problems.

    20.    PLAINTIFF was released from the hospital on June 22, 2018 on his own.

PLAINTIFF never threatened anyone. PLAINTIFF never yelled at anyone. PLAINTIFF never

physically assaulted anyone.

    21.    At no point while PLAINTIFF was at the hospital did he threaten himself or

another person. At no point during the entirety of his interaction did PLAINTIFF verbally or

physically threaten, intimidate, or frighten another person, not did he attempt to do any of these

actions. At no point did PLAINTIFF threaten or engage in self-harm. PLAINTIFF was always

well-groomed and while at the hospital. At no point did PLAINTIFF consent to being in the

hospital.

    22.    From June 21, 2018 until June 22, 2018, PLAINTIFF was never an imminent

danger to himself or others. Even if he was a danger to himself or others, forced hospitalization

would not have been the least restrictive alternative for dealing with PLAINTIFF's condition.

    23.    The entirety of PLAINTIFF's forced hospitalization and forced medication

through pills lacked any medical or safety justification. PLAINTIFF had never been forcibly

hospitalized or voluntarily hospitalized for mental health treatment prior to this occurrence.

    24.    After leaving the hospital, PLAINTIFF made 311 complaints to follow-up with

the complaints he made prior to June 21, 2018. Specifically, on June 24, 2018, PLAINTIFF

called 311 complaining that RIVAS SEARS and DINO DIAZ had contacted the police to come to PLAINTIFF's apartment on June 21, 2018 and forcibly take him to the hospital. PLAINTIFF also made a complaint against Mr. MEDINA, Mr. BYRNE, and Mr. MURPHY, another supervisor of HRA, that he did not want any visitors and wanted his rest. On July 4, 2018 and July 10, 2018, PLAINTIFF called 311 and spoke with Ms. LEDEN, an HRA supervisor, and MAYSSA CHOUBAH, Deputy Commissioner of HRA about his previous 311 complaints he made against HRA. PLAINTIFF also informed Ms. LEDEN that HRA sent the email to Selfhelp falsely alleging he was disturbed so that the police were then called to PLAINTIFF's apartment on June 21, 2018.

25.     Upon PLAINTIFF'S information and belief, RIVAS SEARS sent DINO DIAZ to PLAINTIFF's apartment because of the various complaints PLAINTIFF made with 311 regarding RIVAS SEARS, VALARIE SOTO, and DINO DIAZ. DINO DIAZ would knock on PLAINTIFF's apartment door and leave notes on the door. The notes would state Selfhelp will come on August 3, 2018 to PLAINTIFF's apartment and that we have a key access to enter the apartment. PLAINTIFF called Selfhelp on August 2, 2018 to say he did not want DINO DIAZ or any other individuals to come to his apartment. PLAINTIFF stated his apartment was clean and he had his own equipment. The Selfhelp employee stated that was fine and that no one would come to PLAINTIFF's apartment on August 3, 2018.

26.     On July 13, 2018, HRA issued a decision stating that PLAINTIFF was ineligible to receive adult protective services because PLAINTIFF already had someone else willing and able to responsibly assist him. PLAINTIFF stated that PHILLIP ELIK, serves as PLAINTIFF's Guardian ad Litem and has been willing and able to assist PLAINTIFF.

27.     On or about August 3, 2018, at approximately 9:00am, PLAINTIFF was resting in the living room of his apartment committing no visible crime. PLAINTIFF was not threatening

7

anyone, physically attacking anyone, or causing any disturbance of any kind. PLAINTIFF was nude, groomed and appeared in good physical health.

28.     Around 9:00am, DINO DIAZ, knocked on PLAINTIFF'S door. DINO DIAZ stated there were cleaners there to clean PLAINTIFF'S apartment. PLAINTIFF had not called or requested anyone to come to his apartment and clean it for him. Nor did PLAINTIFF's apartment require cleaning. The apartment was not a danger to him or others. The apartment was appropriately clean. PLAINTIFF called JOHN CRAWFORD, New York Supreme Court Clerk, stating that DINO DIAZ was harassing PLAINTIFF. Mr. CRAWFORD told PLAINTIFF to call 911 as well. PLAINTIFF then called 911 and stated that DINO DIAZ was harassing PLAINTIFF. PLAINTIFF put on his clothes as he waited for police officers to arrive at his apartment.

29.     PLAINTIFF opened the door when he believed the police officers had arrived to assist him. When PLAINTIFF opened his door, JOHN DOE POLICE OFFICERS #9–18 rushed into PLAINTIFF'S apartment. PLAINTIFF did not invite the officers into the apartment. PLAINTIFF did not consent to the officers coming in to the apartment.  JOHN DOE POLICE OFFICERS #9–18 did not ask any questions to PLAINTIFF or announce why they were at his apartment before coming in or after. PLAINTIFF did not exit his apartment. The JOHN DOE POLICE OFFICERS did not have a warrant or any exigent circumstance permitting them to enter PLAINTIFF's home.

30.     JOHN DOE POLICE OFFICERS #9–18 grabbed PLAINTIFF, had spread PLAINTIFF's arms and legs wide, and proceeded to search PLAINTIFF. When the police officers were entering the apartment, DINO DIAZ falsely stated to the police that PLAINTIFF had taken out a knife and attempted to use it against DINO DIAZ. As far as PLAINTIFF knows, this is the first time that DIAZ had made that accusation to the police. JOHN DOE POLICE

8

OFFICERS #9–18 never explained to PLAINTIFF why they had searched him. PLAINTIFF did

not take out a knife and attempt to use it against DINO DIAZ. PLAINTIFF had taken out his Pro

Se complaint to show to JOHN DOE POLICE OFFICERS #9–18. PLAINTIFF noted that several

people dressed in blue shirts with Selfhelp written on their shirts entered his apartment as well

and searched his apartment.

31.     JOHN DOE POLICE OFFICERS #9-19 continued to grab and pull PLAINTIFF,

forcing PLAINTIFF to leave his apartment and then enter an ambulance. PLAINTIFF told

paramedics in the ambulance that he could not breathe and needed his inhaler. PLAINTIFF's

request was ignored. PLAINTIFF was not placed in handcuffs, but the officers' statements and

actions made PLAINTIFF believe that he had to cooperate and that he would be placed in

handcuffs if he did not. PLAINTIFF did not want to go to the hospital. PLAINTIFF was an

imminent danger to himself or any other individual.

32.     PLAINTIFF never threatened DINO DIAZ or JOHN DOE POLICE OFFICERS

#9–18. PLAINTIFF never yelled at DINO DIAZ or JOHN DOE POLICE OFFICERS #9–18.

PLAINTIFF never physically assaulted DINO DIAZ or JOHN DOE POLICE OFFICERS #9–18.

33.     PLAINTIFF was then taken to New York-Presbyterian. PLAINTIFF was placed

in a room and waited a few hours with JOHN DOE SECURITY GUARDS #3–4 before speaking

with JOHN DOE NURSE #2. JOHN DOE NURSE #2 stated that PLAINTIFF was being

removed because he looked upset. At this time, PLAINTIFF was crying and could not breathe.

PLAINTIFF requested to have his inhaler, but his request was denied. JOHN DOE SECURITY

GUARDS #3–4 forced the plaintiff to strip, squat for an anal cavity search, and change into a

gown. PLAINTIFF did not consent to this search. Prior to the search, PLAINTIFF gave no

indication that he had hidden drugs or weapons on his person. These Defendants had no basis to

believe that PLAINTIFF had hidden drugs or weapons on his person.  JOHN DOE SECURITY

GUARDS #3–4 then took PLAINTIFF'S personal belongings. PLAINTIFF was taken to Gracie Square Hospital. JOHN DOE SECURITY GUARDS #3–4 restrained PLAINTIFF on a bed using straps that were attached to the bed. PLAINTIFF was placed into a room and waited a few hours before speaking with a doctor.

34.     PLAINTIFF was afraid to try and leave, was involuntarily committed and imprisoned at the hospital. At no point prior to being involuntarily committed did he threaten to injure himself or another person. At no point did PLAINTIFF verbally or physically threaten, intimidate, or frighten another person, nor did he attempt to do any of these actions.

35.     PLAINTIFF remained at the hospital from August 4, 2018 until August 15, 2018. PLAINTIFF was forcibly hospitalized for 10 days.

36.     Not long after arrival, Dr. REBECCA KASTOPOULOUS, a psychiatrist, came to PLAINTIFF's room. Dr. KASTOPOULOUS asked PLAINTIFF if he wanted to hurt himself, and PLAINTIFF stated no. Dr. KASTOPOULOUS ordered that PLAINTIFF be medicated. Dr. KASTOPOULOUS did not perform an independent evaluation. No hospital staffed performed a medical evaluation of PLAINTIFF. PLAINTIFF did not consent to taking the medication. The medication that was forcibly injected into PLAINTIFF was Risperdal. Despite PLAINTIFF's stated objections to taking the medication, he was held down by JOHN DOE Gracie Square NURSE #1. JOHN DOE Gracie Square NURSE #1 forcibly inserted a needle into PLAINTIFF's arm and pushed a plunger connected to that needle, injecting Risperdal, a medication, into PLAINTIFF's body over PLAINTIFF's objection.

37.     Every time a nurse came to the PLAINTIFF's room every few hours, PLAINTIFF asked to be released from the hospital. That request was denied. Multiple nurses came to speak with PLAINTIFF multiple times a day. PLAINTIFF was told that he would only be released

from the hospital if he took the medication. PLAINTIFF was not told of any other way to be released from the hospital.

38.     While in the hospital, a nurse would regularly tell Plaintiff that he had to take pills prescribed by Dr. KASTOPOULOUS. PLAINTIFF was not given the option to refuse the medication, and he was forced to take it. JOHN DOE Gracie Square NURSE #1 would tell PLAINTIFF that if he did not take the pills, she would report it to her supervisor and the supervisor would send the Male and Female Nurses to return and physically force PLAINTIFF to take the pills.

39.     While in hospital, PLAINTIFF received at least 5 injections. PLAINTIFF was forced to take the pills 2 to 3 times a day. At all times, JOHN DOE Gracie Square NURSE #1 would check PLAINTIFF'S mouth to make sure he swallowed the pills, and at times JOHN DOE Gracie Square NURSE #1 would use his hands to make sure PLAINTIFF swallowed the pills.

40.     The medication made PLAINTIFF groggy and unable to stand straight. At point, PLAINTIFF could not balance himself and hit his head on the nightstand next to his bed. PLAINTIFF complained to multiple nurses about the head pain he felt and asked for medical attention. PLAINTIFF's request was denied.

41.     While PLAINTIFF was in the hospital, PLAINTIFF was informed he had a visitor who wished to speak with him in the cafeteria. PLAINTIFF went to the cafeteria and DINO DIAZ joined the PLAINTIFF. DINO DIAZ yelled at PLAINTIFF, stating no one harassed him and demanded PLAINTIFF apologize to RIVAS SEARS and VALARIE SOTO, Self Help supervisors, if PLAINTIFF wanted to be released from the hospital. DINO DIAZ continued yelling at PLAINTIFF, making PLAINTIFF cry and visibly scared. JANELLE WASHINGTON, a nurse, informed Dr. KASTOPOULOUS what occurred. PLAINTIFF was returned to his room

11

and DINO DIAZ was escorted out of the hospital by security guards. At no point during the entirety of this interaction did PLAINTIFF verbally or physically threaten, intimidate, or frighten another person, nor did he attempt to do any of these actions.

42.     On August 14, 2018, PLAINTIFF was released from the hospital to his own care with the following prescriptions: aspirin, losartan, risperiDONE intramuscular injection, and risperiDONE oral tablet.

43.     At no point while PLAINTIFF was at the hospital did he threaten himself or another person. At no point during the entirety of his interaction did PLAINTIFF verbally or physically threaten, intimidate, or frighten another person, not did he attempt to do any of these actions. At no point did PLAINTIFF threaten or engage in self-harm. PLAINTIFF was always well-groomed and while at the hospital. At no point did PLAINTIFF consent to being in the hospital.

44.     From August 4, 2018 until August 14, 2018, PLAINTIFF was never an imminent danger to himself or others. Even if he was a danger to himself or others, forced hospitalization would not have been the least restrictive alternative for dealing with PLAINTIFF's condition.

45.     The entirety of PLAINTIFF's forced hospitalization and forced medication through needles and pills lacked any medical or safety justification. PLAINTIFF had never been forcibly hospitalized or voluntarily hospitalized for mental health treatment prior to this occurrence.

46.     On August 14, 2018, PLAINTIFF was unable to use his keys to enter his apartment after being discharged from the hospital. Upon PLAINTIFF's information and belief, Self Help had changed the locks on his apartment door. PLAINTIFF waited for two hours outside his apartment because he felts severe pain in his joints and not well enough to move. PLAINTIFF then contacted his superintendent, so he may re-enter his apartment. The

12

superintendent asked a neighbor to watch as he broke down the door to PLAINTIFF's apartment. The super intendent later replaced the locks on the door. Upon entering his apartment, PLAINTIFF noticed his apartment was messy, there was considerable damage, and had items missing. PLAINTIFF found graffiti on the walls, his bedroom door and drawers broken, important documents scattered across his apartment, and his iPhone and cleaning supplies missing. He also noticed his music records, game controllers, boxes of comic books, c his father's television, and his clothes were missing. PLAINTIFF then proceeded to contacted PHILLIP ELIK for help. PHILLIP ELIK came to PLAINTIFF's apartment to assess the damage in PLAINTIFF's apartment and create a list of items that were missing.

13